**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Bruce J. RICE, Defendant,**

**and**

**Rice Aircraft, Inc., Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Bruce RICE, Defendant–Appellant.**

**Nos. 93–30383, 93–30407.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 12, 1994.

Memorandum Filed Aug. 22, 1994.

Decided Nov. 2, 1994.

Jeffrey H. Daichman, Feltman, Karesh, Major & Farbman, New York City, for defendants-appellants.

Bruce D. Carter, Asst. U.S. Atty., Seattle, WA, for plaintiff-appellee.

Thomas H. Mabie, Morgan, Lewis & Bockius, Los Angeles, CA, for amicus Hi–Shear. Bart J. Freedman, Preston, Gates & Ellis, Seattle, WA, for amicus Grumman Aerospace Corp.

Before: GOODWIN, D.W. NELSON, and HALL, Circuit Judges.

### ORDER

The government's request for publication is GRANTED.

The memorandum filed August 22, 1994, is redesignated as an authored opinion by Judge Goodwin.

### OPINION

GOODWIN, Circuit Judge:

After pleading guilty to charges of conspiracy and mail fraud, Rice Aircraft, Inc., a distributor of high-technology aircraft fasteners, and Bruce Rice, its chief executive officer (collectively "Rice") appeal a final judgment ordering them to pay restitution to four companies injured by their criminal conduct. We affirm.

**I.**

Rice Aircraft buys aircraft parts from parts manufacturers and distributes them to airplane manufactures. Hi–Shear Corporation ("Hi–Shear") manufactures high-technology aircraft fasteners (specially designed nuts and bolts or "Hi–Lok" parts) used to attach aircraft engines to wings and wings to aircraft fuselage.

Because fastener failure has serious consequences, both military and commercial aircraft manufacturers require fasteners to meet rigorous quality assurance standards. Shipments must be accompanied by testing reports and documentation, identifying the fasteners by production lot and confirming that samples from the lot, as well as the relevant raw materials, have been tested for quality control. This documentation enables aircraft manufactures to trace discrepant fasteners to certain lots and raw materials.

Rice admits that, beginning in 1982 and continuing "at least until" October 1987, Rice engaged in a scheme to defraud customers and evade these quality assurance procedures. As part of this scheme, Rice employed an unauthorized reprocessing firm to reprocess approximately 7.5 million fasteners. Rice then fraudulently sold these reprocessed fasteners as new. In order to evade their customers' quality assurance procedures, Rice bribed certain Hi–Shear employees to provide them with Hi–Shear test reports and then arbitrarily sent these test reports with untested, reprocessed, fasteners, thereby falsely assuring customers that the reprocessed fasteners had been manufactured and tested under Hi–Shear-approved procedures.

The plea agreement provided that Rice and Rice Aircraft would be jointly and severally liable for restitution and would collectively pay no more than one million dollars in restitution. The district court sentenced Bruce Rice to four years imprisonment for Count I (conspiracy)[1] and to probation on counts II and III (the mail fraud counts); the court sentenced Rice Aircraft to probation and fines.

---

1. The court later reduced Bruce Rice's sentence to three years. ER 159.

On appeal, we affirmed the convictions and Bruce Rice's sentence, specifically affirming the district court's sentencing findings. However, we reversed in part Rice Aircraft's sentence, holding that the district court erred in sentencing Rice Aircraft to probation. Unpublished Memorandum, 937 F.2d 614 (9th Cir.1991). The Supreme Court denied certiorari. —— U.S. ——, 112 S.Ct. 966, 117 L.Ed.2d 132 (1992). On remand, the parties again stipulated that the restitution would be limited to one million dollars, with specific amounts to be determined in subsequent proceedings. April 29, 1992, Stipulated Order, ER 101–02. On the government's motion, the district court ordered Rice and Rice Aircraft to pay one million dollars in restitution, divided pro rata between Grumman Aerospace Corp. ("Grumman"), Hi–Shear, Special–T–Fasteners ("STF") and Defense Industrial Supply Center ("DISC"). Rice timely appealed.

## II. *RESTITUTION*

 Within the statutory framework, a restitution order is reviewed for abuse of discretion. *United States v. Parrott*, 992 F.2d 914, 916 (9th Cir.1993). The legality of a restitution order is reviewed de novo, *id.*, while the district court's underlying factual findings are reviewed for clear error. *United States v. Smith*, 944 F.2d 618, 623 (9th Cir.1991), *cert. denied*, —— U.S. —— 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992).

 Rice's restitution award is legal if either the Federal Probation Act ("FPA") or the Victim and Witness Protection Act ("VWPA") authorizes it.[2] *Parrott*, 992 F.2d at 916–17; *United States v. Weir*, 861 F.2d 542, 546 (9th Cir.1988), *cert. denied*, 489 U.S.

1089, 109 S.Ct. 1555, 103 L.Ed.2d 858 (1989). Under either statute, the government has the burden of establishing by a preponderance of the evidence that the victim's damages were caused by the conduct of which the defendant was convicted. *Parrott*, 992 F.2d at 917.

## III. *GRUMMAN*

Grumman is a Rice customer which manufactures military and civilian aircraft for the Navy and other customers. When Grumman learned of the criminal charges against Rice, it impounded its entire inventory of Rice-supplied fasteners. Since then, it has allegedly been unable to sort potentially fraudulent Rice-supplied fasteners from properly tested and authenticated ones. Because its clients, including the Navy, require all parts to be properly tested and authenticated, Grumman contends it cannot use any of its Rice-supplied fasteners. The district court found that Rice's conduct had tainted Grumman's entire inventory and awarded Grumman restitution based on the value of its entire Rice-supplied inventory.[3]

### A. *The Offense of Conviction.*

 Rice first argues that the restitution award to Grumman was illegal because Grumman's alleged losses were not related to Rice's offense of conviction. *See Hughey v. United States*, 495 U.S. 411, 413, 110 S.Ct. 1979, 1981, 109 L.Ed.2d 408 (1990) (Under the VWPA, restitution may be awarded only for losses "caused by the specific conduct that is the basis of the offense of conviction."); *United States v. McHenry*, 974 F.2d 1031, 1033 (9th Cir.1992) (In conspiracy and fraud cases, restitution under the VWPA is

---

**2.** The FPA applies to offenses committed before November 1, 1987, and allows courts to order defendants, as a condition of probation, to "make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had." 18 U.S.C. § 3651, repealed by Pub.L. No. 98–473, Tit. II, § 212(a)(2), 98 Stat. 1987, 2031 (1984). The VWPA applies to offenses committed after January 1, 1983 and allows courts to order defendants convicted of certain offenses, including mail fraud, *Parrot*, 992 F.2d at 917, and conspiracy to commit mail fraud, *United States v. McHenry*, 974 F.2d 1031 (9th Cir.1991), to

"make restitution to any victim of such offense." 18 U.S.C. §§ 3663, 3664. *Parrott*, 992 F.2d at 916–17. Both the FPA and the VWPA apply to Bruce Rice on the two mail fraud counts for which he received probation, but only the VWPA applies to the conspiracy count. Only the VWPA, however, applies to Rice Aircraft, because this court reversed Rice Aircraft's probation.

**3.** Because of the plea bargain's one million dollar cap on restitution, however, Grumman did not actually recover for the full value of its impounded inventory.

available only for losses caused by the specific acts of which the defendants were convicted.); *United States v. Sharp,* 941 F.2d 811, 815 (9th Cir.1991). *But see United States v. Hammer,* 967 F.2d 339, 340 (9th Cir.1992) (upholding FPA restitution awarded to a fraud victim who did not receive the specific mailings which formed the basis of the defendant's guilty plea and noting that *Hughey* does not apply to restitution awarded under the FPA).

Specifically, Rice contends that it admitted sending false reports with *reprocessed* parts. However, the district court found Rice stopped sending reprocessed fasteners to Grumman in 1984. Grumman bought the impounded inventory after 1985 and thus, according to Rice, the impounded inventory does not contain any reprocessed fasteners. Rice contends that Grumman can recover restitution only for reprocessed fasteners, and not for its impounded inventory.

We disagree. Rice and Rice Aircraft pled guilty not only to reprocessing fasteners but also to sending false test reports. Both Rice and Rice Aircraft specifically admitted paying Hi–Shear employees for test reports during 1986 and 1987 and sending mismatched test reports "beginning in 1985 and continuing until at least October 21, 1987" (Count II). In addition, both stated that they "knowingly used these test reports to misrepresent to certain fastener purchasers that certain fasteners being sold were identified by, and traceable back to, a particular Hi–Shear manufacturing production lot number with the indicated test results." ER 71–72. These admissions are not limited to reprocessed parts.

Rice argues that Grumman cannot prove that any particular part in its inventory was accompanied by a false test report. This argument misstates the issue. Grumman alleges that it cannot use *any* fasteners without reliable documentation and test reports; a Navy employee confirmed that the Navy will not buy aircraft without such documentation and reports. Thus, the issue is not whether Grumman can prove that any particular documents are false, but whether it can prove to its customers' satisfaction that any

particular test reports and documentation are valid.

According to Grumman, it attempted to obtain such proof: it contacted Hi–Shear and attempted to determine which parts were traceable. However, it found that, because of Rice's false documentation, Grumman could not accurately trace Rice's fasteners. In support of this argument, Grumman presented affidavits documenting various "suspicious" paperwork including mismatched numbering and purchase orders which did not correspond to actual inventory. *See, e.g.,* Second Affidavit of Ernest Frank. Rice admits sending purchase orders which did not correspond to actual inventory.

■ The district court's finding that, because of Rice's fraudulent paperwork, Grumman cannot prove to its customers' satisfaction that its Rice-supplied parts meet industry standards was not clear error. To the extent that the victim is unable to determine which merchandise is safe and which is not because of the very fraudulent conduct of which the defendant was convicted, a district court acts well within its discretion in awarding restitution for the entire value of the contaminated merchandise which cannot be resold. *Cf. United States v. Seligsohn,* 981 F.2d 1418, 1421 (3rd Cir.1992) (upholding insurance fraud award for fraudulent claims even though some of the defendant's claims were legitimate where the defendant's own fraudulent conduct prevented the victim from distinguishing between legitimate and fraudulent payments).

### B. *Remoteness.*

■ Rice next contends that the restitution award was too speculative and remote, emphasizing that not all damages cognizable in a civil action can be awarded as restitution. *See United States v. Salcedo–Lopez,* 907 F.2d 97, 98 (9th Cir.1992) (disallowing restitution for the costs of investigation and prosecution); *United States v. Kenney,* 789 F.2d 783, 784 (9th Cir.) (no restitution for salaries of trial witnesses), *cert. denied,* 479 U.S. 990, 107 S.Ct. 586, 93 L.Ed.2d 588 (1986); *United States v. Tyler,* 767 F.2d 1350, 1351–52 (9th Cir.1985) (no restitution for the decline in the value of stolen timber

where the decline was caused by market forces, not the defendant's conduct).

These cases are inapposite. Causation is a question of fact, reviewed for clear error. *Bunting v. United States,* 884 F.2d 1143, 1145 (9th Cir.1989). Here, Rice sent false quality assurances, packed merchandise itself in violation of Grumman requirements, and sent packaging slips which did not correspond to actual merchandise. That such conduct will render one's inventory suspect and make tracing difficult is foreseeable. Grumman's loss is neither remote nor speculative. *See, e.g., Kenney,* 789 F.2d at 784 (upholding restitution awarded to a bank to cover the cost of removing surveillance film from the bank's security camera); *United States v. Koenig,* 952 F.2d 267, 274–75 (9th Cir.1991) (upholding restitution for the cost of reprogramming bank computers after defendants had electronically subverted the bank's automatic teller machine). Like the bank which had an obligation to reprogram its computers to protect its customers, Grumman had an obligation to protect its customers (and the public) by not using fasteners which did not comply with industry standards. The district court found that, in order to fulfill its obligation, Grumman had to impound or refuse to use its Rice-supplied inventory. This finding was not clearly erroneous.

## C. *Proximate Cause.*

Rice also argues that Grumman's own conduct impeded its efforts to sort potentially fraudulent fasteners from properly documented ones and contends and that, therefor, Rice's conduct did not proximately cause Grumman's loss. In support of this argument, Rice alleges that Grumman's impounded warehouse is poorly organized and notes that Grumman's practice of sending fasteners to another company for color coding impedes tracing.

However, whether or not Grumman might have been able to mitigate its damages by keeping better internal records once it received Rice's shipments affords the criminal perpetrator no excuse. A crime victim is not required to mitigate damages. *United States v. Soderling,* 970 F.2d 529, 534 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113

S.Ct. 2446, 124 L.Ed.2d 663 (1993). The district court did not err in finding that Rice's fraud proximately caused Grumman's loss. Abundant evidence supports its finding.

## D. *Testing/Failure to Recall.*

Rice also contends that Grumman could have tested the fasteners and argues that Grumman has made no effort to recall aircraft previously built with Rice-supplied fasteners. In support of these arguments, Rice makes a number of inflammatory comments about Grumman's own misconduct, contending that Grumman has been involved in criminal conduct and has accepted fasteners from other companies which have falsified supporting documentation.

These arguments and attacks on Grumman's credibility are typical of Rice's effort to evade responsibility. They are also attempts to relitigate the factual issues underlying the restitution award. The district court evidently accepted Grumman's testimony that recalling aircraft with Rice fasteners was unnecessary because unsound fasteners would fail immediately during flight testing. It also accepted Grumman's argument that testing fasteners would be impossible (or prohibitively expensive) due to the mixing of various lots in its warehouses and Rice's own failure to adhere to Grumman's packaging requirements. These findings are not clearly erroneous.

## E. *Packaging Slips.*

Rice also argues that the district court improperly considered evidence that Rice sent false packaging slips. Rice contends that, since it pled guilty to falsifying test results, not packaging slips, this conduct was outside the offense of conviction and could not be considered.

We review for abuse of discretion a district court's decision regarding the relevancy of evidence. *United States v. Schaff,* 948 F.2d 501, 505 (9th Cir.1991). No such abuse of discretion occurred here: Grumman introduced the packaging slip issue to explain its inability to trace Rice-supplied fasteners. It submitted evidence that Hi–Shear packag-

ing slips were found in the desk drawer of one of the bribed Hi–Shear employees, that the Hi–Shear employee in question sent Rice packaging slips to enable Rice to indicate that certain fasteners had been packaged by Hi–Shear, when in fact Rice packaged them itself, that Rice obtained a packaging machine in order to package fasteners itself, and that Rice bribed Hi–Shear employees to send fasteners in bulk, so that Rice could package them itself, contrary to Grumman quality control procedures. This evidence was relevant to explain why Grumman could not rely on Rice's packaging slips to determine the origin of its impounded inventory.

Rice did not (and does not) dispute the accuracy of this evidence. Rather, on appeal, Rice specifically admits that it sent Grumman packaging slips which did not correspond to any actual shipments and argues that Grumman is "double-counting" parts by relying on Rice's packing slips. This argument itself supports Grumman's claim that it cannot accurately trace fasteners, and amounts to a request that this court protect Rice from its own fraud. We decline to do so. A company which sends false paperwork in an effort to mislead its customers should not be surprised when it injures itself by its own mendacity. The district court did not abuse its discretion in considering the "packaging slip" issue as an explanation of Grumman's inability to trace its Rice-supplied inventory and any "double-counting" caused by Rice's misleading packaging slips is the result of Rice's own fraud. In any event, Rice has not shown that any double-counting occurred.

### F. *After the Date of the Conspiracy.*

■ Finally, Rice objects that Grumman's impounded inventory includes fasteners purchased after the conspiracy allegedly ended on October 31, 1987. However, Count II, the mail fraud count, alleged that Rice's illegal conduct continued "*until at least* October 31, 1987." The district court therefor did not abuse its discretion in awarding restitution for purchases made in 1988. Moreover, Grumman is apparently unable to sort fas-

teners by shipment due to the effect of Rice's false packaging slips on Grumman's internal procedures.[4] Given these facts, the district court did not abuse its discretion in calculating restitution based on Grumman's entire inventory.

### IV. *HI–SHEAR*

Hi–Shear manufactures and sells fasteners to aircraft manufacturers both directly and through parts distributors such as Rice. Rice pled guilty to bribing various Hi–Shear employees in order to obtain Hi–Shear test reports. According to Hi–Shear, the bribed employees also gave Rice excessive free samples and unauthorized price discounts. In support of this claim, Hi–Shear submitted numerous documents indicating that the bribed employees authorized free samples and extra discounts. Based on this evidence and the grand jury testimony of one of the employees, the district court awarded Hi–Shear restitution for the value of the free samples (less the estimated value of the free samples Rice would have normally received) and the value of the unauthorized discounts.

### A. *Not based on the offense of conviction.*

■ Rice first argues that awarding Hi–Shear restitution for the free samples and discounts was illegal under *Hughey,* 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990). According to Rice, it was convicted of bribing Hi–Shear employees for test reports, not bribing them for free samples and discounts. *Id.* at 413, 110 S.Ct. at 1981.

We disagree. Rice specifically admitted and was convicted of bribing the relevant Hi–Shear employees, including Richard Topp, Hi–Shear's sales manager, during the time when these employees allegedly gave Rice excessive price discounts and free samples. Both Rice Aircraft and Bruce Rice signed admissions indicating that the payments to Topp, which totaled over $22,500 between February 1986 and 1987, were made to "assist the company [Rice Aircraft]." ER 56, 71. The district court similarly found that

---

4. Also, as noted, Grumman's award was reduced by the cap imposed by Rice's plea bargain, thus,

Grumman may not have actually recovered restitution for fasteners received after 1988.

the purpose was to "gain competitive advantage in the industry." ER 92. Thus, Rice's offense of conviction is bribery, not "bribery for test results." If Rice's bribes caused Hi–Shear employees to give Rice unauthorized free samples and excessive discounts, as well as test reports, Hi–Shear may recover restitution for them.

### B. Excessive Free Samples and Price Discounts.

■ Rice also contends Hi–Shear did not give it excessive free samples or price discounts. However, Hi–Shear submitted documents showing that between February 1986 and March 1988, bribed Hi–Shear employees gave Rice some 16,164 free samples. During this period Hi–Shear gave all other distributors a total of 165 free samples. In addition, Hi–Shear notes that it had a policy of not giving any one customer more than a few hundred dollars worth of free samples and notes that the Rice received some $111,927 worth of free samples. Finally, Hi–Shear employees testified that Hi–Shear had a policy of not giving free samples to distributors, who, like Rice, compete with Hi–Shear.

Hi–Shear submitted inventory forms indicating that the bribed employees gave Rice an additional price discount at the time of invoicing. Affidavits from Hi–Shear employees and documentary evidence suggest that this "additional line discount" was not standard Hi–Shear policy and was not given to other customers. Correspondence between Hi–Shear employees indicates that, when Hi–Shear became aware of the additional line discount, it attempted to correct the "error," giving up only when Bruce Rice threatened to tell airline manufacturers that Hi–Shear was raising prices on existing purchase orders. ER 313.

The district court did not clearly err in finding that Rice received excessive price discounts and free samples.

### C. Manufacturing Cost v. Book Value.

■ Rice also argues that Hi–Shear should recover only the manufacturing costs of any illegally gained free samples, and should not recover these samples "book price" which includes a profit markup. We

disagree. Had Rice not obtained the free samples, Hi–Shear would have sold them, for their book-value, either to Rice or to other customers. Thus, the district court did not abuse its discretion in calculating restitution based on the samples' book value.

### D. Proximate Cause.

■ Rice also contends the bribes did not proximately cause the Hi–Shear employees to give Rice the free samples and price discounts. However, Hi–Shear showed that Rice bribed certain Hi–Shear employees and that these bribed employees gave Rice excessive free samples and price discounts. Moreover, Hi–Shear's sales manager, Richard Topp, testified before a grand jury that he took bribes from Rice and gave Rice free samples when it "sought an inordinate number of samples." Topp also testified that, during the relevant period, he gave Rice price concessions. The district court did not clearly err in finding that Rice's bribes caused Hi–Shear employees to give Rice excessive free samples and price discounts.

### E. Waiver and Ratification.

■ Rice also insists that Hi–Shear waived and ratified the free samples and price discounts. It notes that the bribed employees completed inventory forms and other documents and contends that the existence of these forms proves that Hi–Shear knew of and approved the free samples, and thus waived its right to object to them. The district court's factual finding to the contrary is, again, not clearly erroneous: Hi–Shear argues that Rice bribed high-level employees and contends that no Hi–Shear internal control procedures uncovered the illegitimate samples at the time they were given. The district court did not clearly err in accepting these arguments.

■ Rice also contends that Hi–Shear ratified the price discounts, by later offering Rice a similar discount. However, the record indicates that when Hi–Shear allegedly discovered the extra line discount, it wrote Rice that "the backlog of Rice Aircraft is being reviewed at present to determine what discounts have actually been taken and those

offered. An adjustment to the prices will be expected where your pricing errors have occurred.... I have placed a stop order on all Rice shipments until our review is complete." ER 311 (dated March 19, 1987). When Rice protested, threatening to "go back to Grumman, Lockheed, Sikorsky, Douglas and Northrop and explain that the reason for our non-delivery is that Hi Shear is contemplating raising the prices on existing purchase orders," ER 313, Hi–Shear agreed to offer Rice the previously offered discounts, but specifically noted that it would no longer allow Rice to take an additional line discount "at the time of invoicing." ER 314. The district court did not clearly err in finding that Hi–Shear had not ratified the additional line discount.

### F. Date of The Conspiracy.

█ Finally, Rice alleges that Hi–Shear improperly recovered for free samples given after the conspiracy allegedly ended on October 30, 1987. However, Hi–Shear's evidence showed that between February 25, 1985, and March 1988, the bribed employees or their assistants authorized every Hi–Shear requisition slip giving Rice Aircraft free samples. The district court did not abuse its discretion in ruling that Hi–Shear continued to suffer losses as a result of Rice's bribes even after the end of the conspiracy.

### V. SPECIAL–T–FASTENERS ("STF")

█ STF, like Grumman, purchased fasteners from Rice. Declarations of STF's president and an FBI agent indicate that STF purchased at least thirteen lots of Rice-supplied fasteners which were accompanied by false test reports. The district court awarded STF restitution for these fasteners.

Rice argues that the STF award was improper because STF was not named in the government's information. *United States v. Angelica*, 951 F.2d 1007, 1009 (9th Cir.1991). According to Rice, STF is not a "victim"

within the then-existing version of the VWPA.[5]

We disagree. *Angelica* did not hold that only victims specifically named in the indictment may recover restitution; the case simply applied *Hughey* and found that the particular victims at issue were not victims of acts underlying the offense of conviction. 951 F.2d at 1009. While the court referred to "victims not named in the indictment," this language does not create a per se rule that restitution is limited to victims specifically named in the indictment. Here, Rice pled guilty to reprocessing some 7.5 million fasteners and selling them to various companies. STF is one of these companies. It is therefore a victim of Rice's offense.

### VI. DEFENSE INDUSTRIAL SUPPLY CENTER ("DISC")

DISC, another Rice customer, did not show that any particular fasteners were accompanied by fraudulent test reports, but sought restitution for the costs of testing its Rice-supplied fasteners. DISC, unlike Grumman, was apparently able to conduct sample testing. The district court awarded DISC the cost of sample testing.

█ Rice argues that the DISC award was improper because DISC sought restitution for testing fasteners purchased in 1988, after the conspiracy allegedly ended. However, at sentencing, the district court specifically found that "[a]lthough reprocessing ceased by the end of 1983 or early 1984, over seven and a half million of these parts had been reprocessed. The sale of these parts apparently ceased and I find they ceased sometime in 1988." Defendants concede that these factual findings define the scope of their conduct and that the government has been unable to trace some three million reprocessed parts. The district court therefor did not err in finding that because of Rice's criminal conduct, DISC had to incur testing costs in 1988.

---

5. Even if this argument were correct, it would affect only the restitution award against Rice Aircraft, as *Angelica* and *Hughey* address the VWPA and not the FPA. *See United States v. Hammer*, 967 F.2d 339, 340 (9th Cir.1992) (district court has authority to order the defendant,

as a special condition of probation, to make restitution to all the victims of his fraud scheme and not just those who received the mailings which formed the basis of his guilty plea). Bruce Rice was ordered to pay restitution as a condition of probation.

## VII. OTHER ISSUES

### A. Delay in Filing the Restitution Motion.

■ Rice also contends that the district court should have dismissed the government's restitution motion as untimely, as it was filed some thirty-two months after sentencing. *See United States v. Weir*, 861 F.2d 542, 546 (9th Cir.1988), *cert. denied*, 489 U.S. 1089, 109 S.Ct. 1555, 103 L.Ed.2d 858 (1989) ("Shortly after the guilty verdict is the time to make an order of restitution.") (internal quotations omitted); *United States v. Prendergast*, 979 F.2d 1289, 1293 (8th Cir.1992) (holding that the district court abused its discretion in leaving the restitution open in case the defendant "later develop[ed] an ability to pay" and remanding for an immediate resolution of the issue); *United States v. Sasnett*, 925 F.2d 392, 398–99 (11th Cir.1991) (same).

These cases are inapposite. The district court did not leave the restitution issue open indefinitely in case Rice and Rice Aircraft later became solvent; it merely delayed resolution of the restitution issue pending Rice's appeal to this court and petition to the Supreme Court. This decision was not unreasonable, as the outcome of these appeals might have changed the restitution issues. Rice has not shown that they were prejudiced by the delay or that the delay was unreasonable.

### B. Failure to Hold an Evidentiary Hearing.

■ Rice also argues that the district court should have held an evidentiary hearing on restitution. However, "[n]either the [Victim and Witness Protection] Act nor Rule 32 requires the sentencing court to hold an evidentiary hearing on the issue of restitution." *United States v. Keith*, 754 F.2d 1388, 1392 (9th Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 93, 88 L.Ed.2d 76 (1985); *see also United States v. Cloud*, 872 F.2d 846, 855 n. 11 (9th Cir.), *cert. denied*, 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989) ("[N]othing in the text or legislative history of the VWPA [ ] indicate[s] that Congress intended the sentencing hearing to be transformed into a second trial on the issue of restitution. If anything, congressional intent appears to have been quite the contrary.").

■ Rather, the defendant must be afforded notice and an opportunity to be heard on the restitution issue. *United States v. Weir*, 861 F.2d 542, 546 (9th Cir.1988), *cert. denied*, 489 U.S. 1089, 109 S.Ct. 1555, 103 L.Ed.2d 858 (1989); *see also Cloud*, 872 F.2d at 855. Here, the record indicates that Rice had ample notice and opportunity to respond. Rice had three months to respond to the government's motion, filed an answer and numerous documents on the issue, and vigorously argued the legal and evidentiary issues at oral argument. Rice knew restitution was an issue at the time of the plea agreement, and successfully negotiated a plea bargain limiting its liability. The district court did not abuse its discretion in determining that it could resolve the restitution issue based on the parties' voluminous documentary evidence and written affidavits.

### C. Failure to Name Grumman, STF and DISC in Counts II and III.

Finally, Rice complains that Grumman, STF and DISC were not named in Counts II and III, the two counts for which Bruce Rice received probation. Rice contends that, because these counts did not specifically name Grumman, STF and DISC as victims, the district court erred in ordering Bruce Rice to pay restitution to these victims under the FPA.

■ This argument is without merit. Under the FPA, a court can order a defendant to pay restitution to a victim not specifically named in the indictment or information, as long as the district court makes a finding of fact that the claimant was a victim. *See United States v. Hammer*, 967 F.2d 339, 340 (9th Cir.1992); *United States v. Van Cauwenberghe*, 827 F.2d 424, 434–35 (9th Cir. 1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 859 (1988) (the FPA allows restitution to aggrieved parties not named in the counts for which probation is ordered, so long as the district court made a finding of fact that the claimant was a victim); *United States v. Orr*, 691 F.2d 431, 434 (9th Cir. 1982). The case on which Rice relies, *United*

*States v. Angelica,* 951 F.2d 1007, 1009 (9th Cir.1991), discusses the VWPA, not the FPA.

Rice briefed and argued other objections that are without merit.

**AFFIRMED.**